# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| Shelly Delinda Steele, individually and on behalf of all others similarly situated, | ) ) ) ) | No.: |
| Plaintiff, | ) ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| EQUIFAX, INC., | ) ) | |
| Defendant. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Shelly Delinda Steele, individually and on behalf of the class defined below, brings this Class Action Complaint ("Complaint") against Equifax, Inc. ("Equifax"), and alleges as follows:

## INTRODUCTION

1.     Equifax is one of three primary national consumer reporting agencies in the United States, as defined by the Fair Credit Reporting Act, 16 U.S. § 1681, *et seq.* ("FRCA").

2.     Equifax is a gatekeeper for consumers' access to socioeconomic opportunity and advancement. Every day, businesses across the world rely on Equifax's credit profiles to make decisions as to the credit worthiness of consumers.

1

This information impacts many of the most important decisions in the lives of consumers—for instance, whether consumers can buy a house, obtain loans, lease vehicles, or even get a job.

3.      Even further, Equifax's credit profiles are directly related to the loan and leasing agreements for house purchases, vehicle leases, and other loans. Even a small discrepancy in the correct credit scores for a consumer can mean an increase in the interest rate charged, which can directly affect the consumer's loan payment amount and rate of payoff.

4.      On May 27, 2022, Equifax first publicly acknowledged a possible coding error that may have resulted in miscalculation of attributes used in model calculations related to reporting of credit scores.[1]

5.      On August 2, 2022, for the first time, Equifax confirmed that there was, in fact, a coding error in its systems.

6.      From at least mid-March 2022 through April 2022, Equifax provided inaccurate credit scores to lenders about individuals who applied for credit, as a result of the coding error in Equifax's systems (hereinafter "the Coding Error").[2]

---

[1] *See* Steve Goode, *Equifax Telling Lenders Of Potential Errors in Credit Scores*, National Mortgage Professional (May 27, 2022, updated at 3:30 PM), available at https://nationalmortgageprofessional.com/news/equifax-telling-lenders-potential-errors-credit-scores (attached hereto as Exhibit A).

[2] *See* Andrew Ackerman and AnnaMaria Andriotis, *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers*, WALL ST...J (Aug. 2, 2022, 3:11PM), available at Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers - WSJ (attached hereto as Exhibit B).

7.      As part of its role as a consumer reporting agency, Equifax assembles and evaluates credit, public records, and other consumer information into credit reports which are provided to lenders in evaluating credit opportunities for consumers.[3]

8.      Congress created the FCRA to "protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner."[4]

9.      The Consumer Financial Protection Bureau ("CFPB") has recently affirmed that, "[i]n preparing consumer reports, it is not a reasonable procedure to assure maximum possible accuracy" if a consumer reporting agency uses "insufficient identifiers to match information to the consumer who is the subject of the report."[5]

10.      To be able to perform credit reporting services, which involve sensitive consumer credit information, Equifax must adhere to the requirements of laws meant to protect the privacy and accuracy of the information, which includes the FCRA. Equifax's maintenance, use, and furnishing of consumer reports is and was intended

---

[3] *See* 15 U.S.C. § 1681a(d) (defining "consumer report"); *see also* 15 § U.S.C. 1681 (recognizing "a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy").
[4] *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995).
[5] *Id.*

to affect Plaintiff and other Class Members, and the harm caused by the inaccurate credit scores on the consumer reports resulting from the Coding Error was entirely foreseeable to Equifax.

11.     The damages that Plaintiff and Class Members suffered as a result of the Coding Error cannot be resolved by updating the affected credit reports alone. Credit reporting agencies typically offer one free credit report throughout the year, but when a consumer requests any additional credit reports, the consumer is required to pay for the additional reports. The fees charged are out-of-pocket costs to both the Plaintiff and Class Members.

12.     Actions or inactions by Equifax, which led to the Coding Error at issue here, violate its duties and obligations as a credit reporting agency under the FCRA. Each and every instance where Equifax did not comply with 15 U.S.C. § 1681e is a separate violation of the FCRA for the purpose of assessing monetary damages.

13.      Equifax continued to provide inaccurate credit scores and consumer reports, despite the fact there was a coding issue caused by an agent or employee of Equifax. Equifax knew or should have known that Plaintiff and Class Member's consumer reports and credit scores were inaccurate. Thus, Equifax's acts described herein constitute a pattern or practice of knowing violations.

14.     This action seeks to hold Equifax accountable for its conduct and seeks to compensate on behalf of individual consumers who were harmed by Equifax's negligent and/or willful violations of the FCRA.

15.     Plaintiff seeks to recover FCRA statutory damages to the fullest extent allowed by law. Additionally, Plaintiff seeks (i) a sum of money sufficient to provide quality credit repair services to each such person for each of their respective lifetimes; and, (ii) to establish a fund (in an amount to be determined) to which such persons may apply for reimbursement of the time and out-of-pocket expenses they incurred as a result of the Coding Error.

16.     Additionally, Plaintiff seeks injunctive relief requiring Equifax to, inter alia, (i) conduct a full-system audit to properly identify which consumers' credit scores and consumer reports were affected by the Coding Error; (ii) identify and notify each U.S. citizen who was affected by the Coding Error; and (iii) discontinue its above-described wrongful actions, inactions, omissions, want of ordinary care, nondisclosure, and the causes of the Coding Error.

## **PARTIES**

### **A. Plaintiff**

17.     Plaintiff Shelly Delinda Steele is and was a West Virginia citizen during the relevant class period and is a resident of Charleston, West Virginia. Plaintiff Steele applied for and obtained a mortgage in February 2022.

18.     Plaintiff Steele's credit score on Equifax on April 5, 2022 was 783.

19.     By April 15, 2022, Plaintiff Steele's Equifax credit score was 757.

20.     On June 19, 2022, Plaintiff Steele's Equifax credit score dropped to 634.

21.     On August 5, 2022, at the time of the filing of this Complaint, Plaintiff Steele's Equifax credit score is 691.

22.     Plaintiff Steele took no actions that should have lowered her credit score so drastically.

23.     In fact, at all relevant times, Plaintiff Steele's credit scores through the other "big three" credit reporting agencies, Experian and TransUnion, were in the high 700s.

24.     After securing her mortgage, Plaintiff Steele began applying for financing for home improvement and appliance loans in May 2022. Plaintiff Steele did a soft inquiry for a general construction loan through Chase Visa.

25.     Because of her low Equifax credit score, Plaintiff Steele that was not eligible for "best rates."

26.     Because Plaintiff Steele was not eligible for "best rates," the artificially and unnecessarily high interest rates were unworkable and as a result, Plaintiff Steele could not enter the agreements and could not complete the home improvement projects.

27.     Plaintiff Steele had to research loan providers to try and determine which "big three" credit reporting agency would be used to determine loan approval and interest rate.

28.     Additionally, as a direct result of Plaintiff's inaccurate credit score through Equifax, Plaintiff Steele paid for and maintained FICO credit monitoring, a paid feature, to monitor the issues with her Equifax score, which kept her from being able to qualify for "best rates" for a construction loan.

**B. Defendant**

29.     Defendant Equifax, Inc. is incorporated in Georgia with its headquarters and principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309. It is a citizen of Georgia.

30.     Equifax is one of the major credit reporting agencies in the United States. As a credit reporting agency, Equifax maintains information related to the credit history of consumers and provides the information to credit grantors who are considering a borrower's application for credit or who have extended credit to the borrower. As a credit reporting agency, Equifax is engaged in a number of credit-related services and supplied over 2.1 billion credit care files to lenders in 2021.[6]

---

[6] See Equifax Company Profile, Equifax http://www.equifax.com/about-equifax/company-profile (last visited Aug. 5, 2022.)

## JURISDICTION AND VENUE

31.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), provides federal courts original jurisdiction over any class action in which any member of a class is a citizen of a state different from any defendant, and in which the amount in controversy exceeds in the aggregate $5 million exclusive of interest and costs.

32.      This Court has personal jurisdiction over Equifax because Equifax resides in this venue, has systematic and continuous contacts within the State of Georgia, and has sufficient minimum contacts in Georgia. Equifax intentionally availed itself of this jurisdiction by conducting its corporate operations in Georgia.

33.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Equifax is headquartered in this District, it regularly transacts business in this District, and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Millions of Consumers Are Affected by The Coding Error

34.      On May 27, 2022, National Mortgage Professional first reported that Equifax provided inaccurate credit scores for millions of U.S. consumers seeking

loans during a three-week period in 2022.[7]

35.     According to reports from consumers and public reporting, Equifax sent the erroneous scores of people applying for auto loans, mortgages, and credit cards to banks and nonbank lenders related to individuals applying for lines of credit.[8]

36.     The scores were sometimes off by 20 points or more in either direction, which was, according to public reporting, "enough to alter the interest rates consumers were offered or to result in their applications being rejected altogether."[9]

37.     However, upon information and belief, some scores were inaccurate by as much as 142 points.

38.     According to public reporting, "[t]he inaccurate scores were sent from mid-March through early April."[10] Equifax did not begin disclosing the errors to lenders in May despite the clear need for accuracy in the credit reporting.[11]

39.     In a statement on May 27, 2022, Equifax acknowledged "there had been a coding issue within a program slated for replacement, and that it may have resulted in a potential miscalculation of certain attributes used in model calculations."[12]

---

[7] *See* Exhibit A.
[8] *Id.*
[9] *See* Exhibit B.
[10] *Id.*
[11] *See* Exhibit A.
[12] *Id.*

40.     Further, Equifax allegedly acknowledged in May 2022, that, at least for some transactions, certain attribute values—such as "number of inquiries within one month" or "age of oldest tradeline"—were potentially incorrect.[13]

41.     Although Equifax *privately* acknowledged potential errors in credit reports, publicly Equifax stated that the credit reports were not affected.

42.     Mark Begor, Equifax's chief executive, first publicly acknowledged the Coding Error at a June investor conference, calling it a coding issue that affected "legacy applications that resulted in some scores going out that had incorrect data."[14] He then claimed that the coding error was resolved and that the company takes issues with its data seriously.[15]

43.     Even though millions of consumers had inaccurate information provided to lenders, "[t]he impact is going to be quite small," Mr. Begor said, "not something that's meaningful to Equifax."[16]

## B. Equifax Had an Obligation to Ensure Maximum Possible Accuracy in Consumer Reports

44.     Equifax is one of three major credit reporting agencies in the United States as defined in the FCRA. 15 U.S.C. § 1681a(f).

---

[13] *Id.*
[14] Exhibit B.
[15] *Id.*
[16] *Id.*

45.     As a credit reporting agency, Equifax generates, provides, and sells consumer reports (otherwise known as "credit reports") containing consumer information and details or a consumer's credit history. This information is provided to business and its recurring clients.

46.     Consumer reports are used by parties to determine whether and on what terms a consumer will be offered credit, which includes credit cards, loans (student, car, and small business), mortgages, rental housing, and insurance.

47.     Consumer reports are defined by the FCRA as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" in lending decisions.[17]

48.     Equifax boasts its services as a "global data, analytics, and technology company" that "play[s] an essential role in the economy by helping companies in diverse industries such as automotive, communications, utilities, financial services, fintech, healthcare, insurance, mortgage, professional services, retail, e-commerce, and government agencies, make critical decisions with greater confidence."[18]

---

[17] 15 U.S.C. § 1681a(d)(1).
[18] About Us, EQUIFAX, https://www.equifax.com/about-equifax/who-we-are/ (last accessed Aug. 5, 2022).

49.     On its website, Equifax claims to "maintain[] and use[] data that is *accurate*, relevant, and timely."[19]

50.     The FCRA creates legal standards and requirements that support that accurate credit reporting is required because of the importance to both consumers and business that credit reports are accurate.[20]

51.     Additionally, consumer reporting agencies "shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates," when preparing a consumer report.[21]

52.     Further, the FCRA places strict obligations on credit reporting agencies, such as Equifax, when it comes to maintaining the accuracy of consumer credit reports. According to the CFPB, "[a]ccuracy in consumer reports is of vital importance to the consumer reporting system, particularly as consumer reports play an increasingly important role in the lives of American consumers."[22]

53.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies preparing consumer reports are required to "follow reasonable procedures to assure

---

[19] Privacy, EQUIFAX, https://www.equifax.com/privacy/ (last accessed Aug. 5, 2022) (emphasis added).

[20] Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Name-Only Matching Procedures,* 86 FR 62468(Nov. 10, 2021) ("*Fair Credit Reporting*"), available at https://files.consumerfinance.gov/f/documents/cfpb_fair-creditreporting_advisory-opinion_2022-07.pdf.

[21] 15 U.S.C. § 1681e(b).

[22] *Fair Credit Reporting*, *supra n.20*.

maximum possible accuracy of the information concerning the individual about whom the report relates."

54.     Accordingly, Equifax was required to assure maximum possible accuracy with respect to information that is contained on an individual's consumer report, which would include the credit score.[23]

55.     The CFPB has recently affirmed that, "[i]n preparing consumer reports, it is not a reasonable procedure to assure maximum possible accuracy" if a consumer reporting agency uses "insufficient identifiers to match information to the consumer who is the subject of the report."[24]

56.     While Equifax is allowed to perform credit reporting services, which involve sensitive consumer credit information, it must adhere to the requirement of laws, like those within the FCRA, which are meant to protect consumers by ensuring that the information remains private and is accurate. Equifax's maintenance, use, and furnishing of consumer reports is and was intended to affect the Plaintiff and other Class Members, and the harm caused by the inaccuracies on consumer reports resulting from the Coding Error was entirely foreseeable to Equifax.

---

[23] Consumer Fin. Prot. Bur., *Fair Credit Reporting: Permissible Purposes for Furnishing and Using and Obtaining Consumer Reports*, 87 FR 41243 (Jul. 7, 2022), available at https://www.federalregister.gov/d/2022-14823/p-41 at page 41245 .
[24] *Id.*

## C. Coding Errors Impacts

57.     Equifax references its part in a consumer's "pivotal" life moments, acknowledging its understanding of the importance of "maintaining and using data that is **_accurate_**, relevant, and timely."[25] This further boasts that maximum possible accuracy is no less important today, as when the FCRA was first enacted in 1970.[26]

58.     Indeed, according to the CFPB, "inaccurate information in consumer reports can have significant adverse impacts on consumers. These impacts are particularly concerning for prospective renters and job seekers struggling to recover from the impacts of the COVID–19 pandemic."[27]

59.     The CFPB recently raised concerns that "[c]onsumers with inaccurate information in their consumer reports may, for example, [may] be denied credit or housing they would have otherwise received or may be offered less attractive terms than they would have been offered if their information had been accurate."[28]

60.     This concern became reality for millions of individuals including Plaintiff and Class Members, who were offered less attractive terms than they would have received if their information was accurately maintained and reported to

---

[25] Privacy, EQUIFAX, https://www.equifax.com/privacy/ (last accessed Aug. 5, 2022) (emphasis added).
[26] *Fair Credit Reporting*, *supra, n.20*.
[27] *Id*.
[28] *Id*.

businesses. Even worse, some Class Members may have even been outright denied credit or housing because of Equifax's inaccurate reporting.

61.     Initially, it appeared as if the Coding Error was limited to individuals who applied for mortgages, and the "company said that less than 9% experienced a change of 10 points or less; less than 3% experienced a change of 11 to 20 points; and less than 1% experienced a change of more than 20 points."[29]

62.     Nearly 2.5 million credit reports were requested from the three major credit reporting agencies during the Coding Error and as a result, it is likely that hundreds of thousands, if not millions, of consumers were directly harmed by Equifax's actions and inactions.[30]

63.     As a result of Equifax's inaccurate reporting of consumer credit information, Plaintiff and Class Members have experienced, *inter alia*, the following injuries:

a. Loss of use of and access to financial accounts and/or credit;

b. Impairment of their credit scores, ability to borrow, and/or ability to obtain credit;

c. Lowered credit scores resulting from credit inquiries following inaccurate reports being provided to lenders;

---

[29] Exhibit A.
[30] Exhibit B.

d. costs and lost time obtaining credit reports in order to monitor their credit records to attempt to understand the reasoning behind the denials due to the Coding Error;

e. lost opportunity costs and loss of productivity from efforts to mitigate and address the adverse effects of the Coding Error, including but not limited to efforts to research how to prevent, detect, contest, and recover from the Coding Error;

f. loss of opportunity to control how their personal information is used; and,

g. continuing risks to their financial health, which remains subject to further harmful inaccurate reporting if Equifax fails to undertake appropriate, legally required steps to protect and ensure the maximum possible accuracy when creating consumer reports using the personal information in its possession.

64.    The damages that Plaintiff and Class Members have suffered as a result of the Coding Error cannot be resolved by updating the affected credit reports alone. Credit reporting agencies typically offer one free credit report throughout the year, but when a consumer requests any additional credit reports, the consumer is required to pay for the additional reports. The fees charged are out-of-pocket costs to both the Plaintiff and Class Members.

65.    Equifax's actions or inactions that allowed for the Coding Error also violate its duties and obligations as a credit reporting agency under the FCRA, as described in detail herein. Each instance in which Equifax has failed to comply with

15 U.S.C. § 1681e constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

66.      Actions or inactions by Equifax, which led to the Coding Error at issue here, violate its duties and obligations as a credit reporting agency under the FCRA. Each and every instance where Equifax did not comply with 15 U.S.C. § 1681e is a separate violation of the FCRA for the purpose of assessing monetary damages.

67.       Equifax continued to provide inaccurate credit scores and consumer reports, although there was a coding issue caused by an agent or employee of Equifax. Equifax knew or should have known that Plaintiff and Class Member's consumer reports and credit scores were inaccurate. Thus, Equifax's acts described herein constitute a pattern or practice of knowing violations.

68.      Plaintiff seeks to recover FCRA statutory damages to the fullest extent of allowed by law. Additionally, Plaintiff seeks a (i) a sum of money sufficient to provide quality credit repair services to each such person for each of their respective lifetimes; (ii) establish a fund (in an amount to be determined) to which such persons may apply for reimbursement of the time and out-of-pocket expenses they incurred as a result of the Coding Error; (iii) disgorge its gross revenue from transactions, including but not limited to the revenue derived from selling inaccurate consumer reports and credit scores to business clients and the earnings on such gross revenue.

69.     Plaintiff seeks injunctive relief requiring Equifax to, inter alia, (i) conduct a full-system audit to properly identify which consumers' credit scores and consumer reports were affected by the Coding Error; (ii) identify and notify each U.S. citizen who was affected by the Coding Error; and (iii) discontinue its above-described wrongful actions, inactions, omissions, want of ordinary care, nondisclosure, and the causes of the Coding Error.

70.     Plaintiff and Class Members have standing to sue as a result of Equifax's violations of federal and state statutes, including the FCRA, as detailed herein. Further, because of Equifax's acts and/or omissions, willful disregard and conduct, and want of ordinary care, and the resulting harm from the Coding Error. Plaintiff and Class Members have suffered actual injury have suffered (and will continue to suffer) economic damages and other injury and actual harm as described above.

## CLASS ALLEGATIONS

71.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on their own behalf and as representatives of the following nationwide Class:

All individuals and entities in the United States whose credit score or consumer report was inaccurately reported or inaccurately provided to potential lenders as a result of "the Coding Error."

72.     The members of the Class are so numerous that joinder of all Class Members in this action is impracticable.  Plaintiff believes that there are thousands of members of the Class.

73.     There are questions of law and fact common to the Class, including but not limited to the following:

a.     Whether Equifax disclosed (or adequately disclosed) the Coding Error to lenders or consumers;

b.     Whether Equifax used reasonable procedures to ensure that the information included on consumer credit reports was accurate;

c.     Whether Equifax's conduct violates the FCRA;

d.     Whether Equifax acted willfully or negligently when allowing the Coding Error to continue without remedy;

e.     Whether Plaintiff and Class Members are entitled to injunctive relief to enjoin the unlawful conduct alleged herein;

f. Whether Plaintiff and Class Members have sustained damages as a result of Equifax's conduct; and

g.     The appropriate type and/or measure of damages or restitution.

74.     Plaintiff's claims are typical of the claims of all members of the Class because Plaintiff and all members of the putative Class have been damaged by the same unlawful and improper uniform misconduct by Equifax, as alleged herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class.  In addition, Plaintiff is represented by Counsel who are experienced and competent in the prosecution of complex litigation, including class action litigation.  Finally, the interests of Plaintiff are coincident with, and not antagonistic to, those of the Class.

76.     Plaintiff knows of no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### Rule 23(b)(2)

77.     This action is appropriate as a class action pursuant to Rule 23(b)(2). Plaintiff seeks injunctive relief for the Class.  Equifax has acted in a manner generally applicable to each member of the Class by allowing inaccurate credit entries and/or credit scores to be included on consumer reports and failing to identify, implement, maintain, and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to protect Plaintiff's and Class Members' Equifax consumer accounts.

78.     Equifax's wrongful conduct described herein will subject Plaintiff and Class Members to continuing future harm and will cause irreparable injuries to Plaintiff and Class Members whose credit entries and/or credit scores were inaccurately reported.  Specifically, Equifax should be required to conduct a full-system audit to properly identify which consumers' credit scores and consumer

reports were affected by the Coding Error, identify and notify each U.S. citizen who was affected by the Coding Error, and discontinue its above-described wrongful actions, inaction, omissions, want of ordinary care, nondisclosures, and the causes of the Coding Error. The adverse financial impact of Equifax's unlawful actions is continuing and, unless preliminarily and permanently enjoined, will continue to irreparably injure Plaintiffs and the Class Members.

## **Rule 23(b)(3)**

79.     This action is also appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

80.     The common questions of law and fact described above predominate over any individualized questions and can be resolved with a common damages methodology.

81.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that could result from individualized litigation. Further, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Class action treatment will also permit the adjudication of relatively small claims by the Class Members,

21

as measured against the effort and expense required to individually litigate claims against Equifax.

## CAUSES OF ACTION

### COUNT I
### WILLFUL VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681, *et seq.*
### (On Behalf of Plaintiff and the Nationwide Class)

82.     Plaintiff hereby incorporates Paragraphs 1 through 81 as if fully stated herein.

83.     In enacting the FCRA, Congress enumerated several findings made, including the need for consumer reporting agencies to "assume a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(4).

84.     At all relevant times, Equifax was a consumer reporting agency as defined by the FCRA.  Under 15 U.S.C. § 1681a(f), a "consumer reporting agency" is "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."

85.     At all relevant times, Equifax had compiled and maintained a "consumer report" on Plaintiff and Class Members as defined by the FCRA: "any

written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b . . . ." 15 U.S.C. § 1681a(d)(1).

86. As individuals, Plaintiff and Class Members are consumers entitled to the protections under the FCRA.  15 U.S.C. § 1681a(c).

87. As a consumer reporting agency, Equifax was (and continues to be) required to identify, implement, maintain, and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard, protect, and ensure the accuracy of the consumer credit information in its possession, custody, and control, including Plaintiff's and Class Members' credit reports and credit scores. *See* 15 U.S.C. 1681(b); 1681e(b).

88. As a consumer reporting agency, Equifax's actions or inactions that allowed for the Coding Error violate its duties and obligations as a credit reporting agency under the FCRA.

89.     Defendant's actions or inactions that allowed for inaccurate credit entries and or credit scores to be included on consumer reports also violate its duties and obligations as a credit reporting agency under the FCRA.

90.     As alleged herein, Equifax has engaged in a number of practices that, taken together, resulted in Equifax's failure to use reasonable measures to provide for the maximum possible accuracy on consumer credit reports.  These actions include, but are not limited to, Equifax's failure to:

a. develop and disseminate comprehensive information integrity policies, including those related to information verification related to the consumer reports and credit scores of Plaintiff and Class Members;

b. assess the risks of using code that could and did lead to inaccurate credit scores and/or consumer reports being sent to lenders; and

c. take appropriate action to correct existing vulnerabilities or threats to personal information in light of known risks, especially those that led to the Coding Error.

91.     The lack of such reasonable data integrity and security measures directly caused damages to Plaintiff and Class Members, as detailed herein.

92.     By its above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting harm to Plaintiff and Class Members, Equifax willfully and recklessly violated the FCRA, 15 U.S.C. § 1681, *et seq.*, by failing to identify, implement, maintain, and monitor the proper data security measures,

policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' Equifax consumer accounts that contained their Consumer Data and PII.

93.     Equifax's actions due to the Coding Error further violated 15 U.S.C. § 1681e(b), which requires Equifax to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

94.     But for Equifax repeatedly creating inaccurate consumer reports as a result of the Coding Error, Plaintiff and Class Members would not have suffered the harm detailed herein.

95.     Despite lacking sufficient testing procedures regarding the accuracy of the consumer reports and credit scores that would have prevented the Coding Error, Equifax relied on its insufficient and unreasonable procedures, and thus Equifax had no reason to believe that all of the information it included its consumer report accurately pertained to the consumer who is the subject of the user's request.

96.     As a direct and proximate result of Equifax's actions and failures to act described herein, Equifax offered, provided, and furnished Plaintiff's and Class Members' inaccurate consumer reports.  In each instance, Equifax was in violation of 15 U.S.C. § 1681e.

97.     Equifax's failure to comply with the foregoing requirements was willful because Equifax knew or should have known, but recklessly disregarded, that its information verification measures were inadequate and unreasonable and additional steps were necessary to protect Plaintiff and Class Members from the Coding Error.

98.     Equifax's willful failure to use reasonable information verification procedures resulted in a yet unknown number of inaccuracies on Equifax consumer account holder's credit reports, in violation of 15 U.S.C 1681e(b).

99.     Moreover, Equifax's actions constitute a pattern or practice of knowing violations, and each instance in which Equifax failed to comply with 15 U.S.C. 1681e(b) constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

100.    Under Section 1681 of the FCRA, Equifax is liable to Plaintiff and Class Members for their actual damages (to be proven at trial) as a result of Equifax's failure to comply with the FCRA requirements that a consumer reporting agency not disclose consumer reports and take measures designed to avoid the unauthorized disclosure of consumer reports.  In addition to actual damages, Equifax is also liable for Plaintiff's and Class Members' costs and reasonable attorneys' fees, in amounts to be proven at trial, as well as punitive damages as the Court may allow.  15 U.S.C. § 1681n(a).

**COUNT II**
**NEGLIGENT VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681,** *et seq.*
**(In the Alternative, on Behalf of Plaintiff and the Nationwide Class)**

101.     Plaintiff hereby incorporates Paragraphs 1 through 101 as if fully stated herein.

102.     By its above-described wrongful-actions, inaction and omissions, want of ordinary care, and the resulting harm to Plaintiff and Class Members, Equifax willfully and recklessly violated the FCRA, 15 U.S.C. § 1681, *et seq.*, by failing to identify, implement, maintain, and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' Equifax consumer accounts that contained their Consumer Data and PII.

103.     Equifax's actions due to the Coding Error further violated 15 U.S.C. § 1681e(b), which requires Equifax to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

104.     But for Equifax repeatedly creating inaccurate consumer reports as a result of the Coding Error, Plaintiff and Class Members would not have suffered the harm detailed herein.

105.     Despite lacking sufficient testing procedures regarding the accuracy of the consumer reports and credit scores that would have prevented the Coding Error,

27

Equifax relied on its insufficient and unreasonable procedures, and thus Equifax had no reason to believe that all of the information it included its consumer report accurately pertained to the consumer who is the subject of the user's request.

106.    As a direct and proximate result of Equifax's actions and failures to act described herein, Equifax offered, provided, and furnished Plaintiff's and Class Members' inaccurate consumer reports.  In each instance, Equifax was in violation of 15 U.S.C. § 1681e.

107.    Equifax's failure to use reasonable information verification procedures resulted in a yet unknown number of inaccuracies on Equifax consumer account holder's credit reports, in violation of 15 U.S.C 1681e(b).

108.    Each instance in which Equifax negligently failed to comply with 15 U.S.C. 1681e(b) constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

109.    Under Section 1681 of the FCRA, Equifax is liable to Plaintiff and Class Members for their actual damages (to be proven at trial) as a result of Equifax's failure to comply with the FCRA requirements that a consumer reporting agency not disclose consumer reports and take measures designed to avoid the unauthorized disclosure of consumer reports.  In addition to actual damages, Equifax is also liable for Plaintiff's and Class Members' costs and reasonable attorneys' fees, in amounts

to be proven at trial, as well as punitive damages as the Court may allow.  15 U.S.C.

§ 1681n(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment:

A. Certifying the Class as requested herein;

B. Awarding Plaintiff and Class Members compensatory damages in an
   amount to be determined at trial;

C. Awarding Plaintiff and Class Members attorneys' fees and costs;

D. Punitive damages;

E. Awarding Plaintiff and Class Members injunctive relief; and

F. Affording Plaintiff and Class Members with such further and other relief
   as deemed just and proper by the Court in law or equity.

## JURY DEMAND

Plaintiff demands a jury rial of all issues triable by right by jury.


Dated: August 5, 2022                     Respectfully submitted,

                                          **BEASLEY, ALLEN, CROW, METHVIN,
                                          PORTIS & MILES, P.C**.

                                          */s/  H. Clay Barnett, III*
                                          **H. Clay Barnett, III  (GA Bar No. 74058)**
                                          Overlook II
                                          2839 Paces Ferry Road SE, Suite 400
                                          Atlanta, Georgia 30339
                                          Clay.Barnett@Beasleyallen.com

W. Daniel "Dee" Miles, III*
**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
218 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com

*Attorneys for Plaintiff and the Putative
Class*
*\*Pro hac vice Application Forthcoming*